## KARL L. MATTHIES AND DEBORAH MATTHIES, PETITIONERS *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22196–07.       Filed February 22, 2010.

A profit-sharing plan of Ps' wholly owned S corporation bought a life insurance policy on Ps' lives with funds rolled over from H's IRA. The profit-sharing plan later sold the policy to H for $315,023, which slightly exceeded the policy's cash surrender value, net of a $1,062,461 surrender charge. For income tax purposes, Ps valued the policy at its net cash surrender value and reported no gain on the transaction. R determined that the policy should be valued without any reduction for surrender charges and that the bargain sale of the insurance policy gave rise to taxable income to Ps. *Held*: Pursuant to sec. 1.402(a)–1(a)(2), Income Tax Regs., as in effect before amendment in 2005, the value of the insurance policy is determined by reference to its "entire cash value", which allows no reduction for surrender charges. *Held, further*, the bargain element of the sale of the insurance policy represented taxable income to H pursuant to sec. 61, I.R.C. *Held, further*, because they had a reasonable basis for their return position, Ps are not liable for the accuracy-related penalty for negligence under sec. 6662(a), I.R.C.

*Richard A. Sirus*, for petitioners.
*Naseem J. Khan* and *David S. Weiner*, for respondent.

141

THORNTON, *Judge*: For each of petitioners' taxable years 2000 and 2001, respondent determined a $294,925 deficiency and a $58,985 accuracy-related penalty for negligence under section 6662(a).[1] After concessions, the issues for decision are: (1) Whether in 2000 petitioners realized $1,053,304 of taxable income from a bargain sale to Karl L. Matthies (petitioner) of a life insurance policy by a profit-sharing plan created for petitioners' wholly owned S corporation; and (2) whether for 2000 petitioners are liable for the section 6662(a) accuracy-related penalty for negligence.

### FINDINGS OF FACT

When they filed their petition, petitioners resided in California. At all relevant times, petitioner was a stock analyst.

In 1998 petitioners employed an attorney of their long acquaintance, Philip Spalding, Sr., to help plan their estate. Philip Spalding, Sr., introduced petitioner to his son, Philip Spalding, Jr., who was an insurance agent. The Spaldings proposed, among other things, that petitioner use some of his IRA funds to buy life insurance through a profit-sharing plan pursuant to a so-called Pension Asset Transfer (PAT) plan marketed by GSL Advisory Service (GSL) and Hartford Life Insurance Co. (Hartford Life).

*Pension Asset Transfer Plan*

In 1997 Edwin Lichtig and Larry Weiss, the principals of GSL, had published an article in a pension plan guide, which described the PAT plan as a strategy to "transfer qualified pension assets or IRA dollars to the participant or the participant's family without significant taxation." The article suggested moving IRA funds to a profit-sharing plan to buy life insurance. The article and other GSL promotional materials that were provided to the Spaldings recommended these steps to implement the PAT plan: Creating a profit-sharing plan using GSL's nonstandardized prototype plan; getting a positive Internal Revenue Service (IRS) determination letter; purchasing a life insurance policy inside the profit-sharing plan; paying the premiums through the profit-sharing plan;

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code (Code) in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

transferring the policy from the plan to the client; paying tax on the policy value when it is transferred; and giving the policy to the client's heirs or to a trust.

*Bellagio Partners and Profit-Sharing Plan*

Petitioners, assisted by GSL, Philip Spalding, Sr., and Philip Spalding, Jr., implemented a plan following essentially the steps just described. On October 22, 1998, they incorporated Bellagio Partners, Inc., an S corporation. At all relevant times petitioners were 100-percent owners of Bellagio Partners, Inc.

On October 27, 1998, pursuant to the provisions of GSL's prototype plan, petitioners created for Bellagio Partners, Inc., a profit-sharing plan (the profit-sharing plan). Petitioners were the sole trustees and committee members of the profit-sharing plan. On October 26, 1999, the profit-sharing plan received a favorable determination letter from the IRS.

*The Life Insurance Policy*

In January 1999 the profit-sharing plan purchased through Philip Spalding, Jr., a Hartford Life last survivor interest-sensitive life insurance policy (the insurance policy). The face amount of the insurance policy was $80,224,252.

In 1999 and 2000 petitioner made two transfers of $1,250,000 from his IRA to the profit-sharing plan; in 2001 he made a $25,500 cash contribution. On February 4, 1999, and again on February 4, 2000, the profit-sharing plan paid a $1,250,003.63 premium on the insurance policy, for total premiums paid of $2,500,007.26.

Effective December 29, 2000, the profit-sharing plan transferred ownership of the insurance policy to petitioner. On the same date, petitioner transferred $315,023 to the profit-sharing plan. At the time of the transfer, the "account value" of the insurance policy, as defined therein, was $1,368,327.33.[2] The "cash value" of the insurance policy, as defined therein, was $305,866.74. The insurance policy defined the "cash value" to be the account value minus any

---

[2] The insurance policy defined the "account value" on any policy anniversary as the account value on the previous policy anniversary (with an initial account value of zero); plus the net annual premium for the last policy year; minus the deduction amount for the last policy year; plus interest credited since the last policy anniversary. According to the insurance policy, the "deduction amount" includes the cost of insurance and the expense charge.

applicable surrender charge. The surrender charge, as stated in the insurance policy, was $1,062,460.59 during the first 3 policy years. After the third policy year, the surrender charge declined each year at an increasing rate until being phased out entirely in the 20th policy year.

*The Replacement Policy*

On January 11, 2001, petitioner transferred ownership of the insurance policy to his family irrevocable trust (the trust), of which Bruce G. Potter was trustee. On January 12, 2001, the trust exchanged the insurance policy for a Hartford Life variable last survivor policy (the replacement policy) with a face amount of $19,476,516. Hartford Life waived surrender charges on the exchange, and the replacement policy provided for no surrender charges. Petitioners paid no commissions on the transferred account value. Hartford Life accepted the $1,368,327.33 account value of the insurance policy as payment in full of the $1,368,327.33 single premium due on the replacement policy. Thereafter, no additional premiums were paid on the replacement policy.

*Petitioners' Income Tax Returns*

On their joint Federal income tax returns, petitioners reported no income from the transfer of the insurance policy from the profit-sharing plan to petitioner. In the notice of deficiency respondent determined that for 2000 petitioners had $1,053,304 of gross income from the transfer of the insurance policy and were liable for a $58,985 accuracy-related penalty for negligence pursuant to section 6662(a).[3]

OPINION

On December 29, 2000, the profit-sharing plan transferred the insurance policy to petitioner, and he transferred $315,023 to the profit-sharing plan. The parties disagree as to whether this transaction resulted in taxable income to petitioners. The nub of their disagreement is the proper valu-

_____

[3] In the notice of deficiency respondent made identical determinations with respect to petitioners' 2000 and 2001 taxable years. On brief respondent explains that this was because initially he did not know whether the life insurance contract had been transferred to petitioner in 2000 or 2001. The parties have stipulated that the transfer of the life insurance policy occurred Dec. 29, 2000. Respondent concedes that there is no deficiency or penalty due from petitioners for taxable year 2001.

ation of the insurance policy as of the date it was transferred to petitioner.

## A. *The Parties' Contentions*

Respondent asserts that on the date the profit-sharing plan transferred the insurance policy to petitioner, it was worth $1,368,327.33, which respondent asserts represents the policy's fair market value. Respondent further asserts that the $1,053,304 (rounded) bargain element of the sale ($1,368,327.33 fair market value minus $315,023 of consideration paid) represents taxable income to petitioner.

Petitioners counter that there was no bargain sale because the $315,023 that petitioner paid to the profit-sharing plan for the insurance policy exceeded its $305,866.74 net cash value and interpolated terminal reserve value as reported by Hartford Life for the date of the transfer. Under petitioners' view, because there was no bargain sale, the transfer of the insurance policy to petitioner resulted in no taxable income to him.

The $1,062,460.59 difference between the parties' respective valuation figures exactly equals the surrender charge stated in the insurance policy. In essence, then, the parties disagree as to whether in valuing the insurance policy, reduction should be made for the surrender charge.

## B. *Burden of Proof*

As a general matter, the Commissioner's determination is presumptively correct, and the taxpayers bear the burden of proving that they did not receive additional income as determined by the Commissioner. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In certain circumstances, the burden of proof with respect to any factual issue may be shifted to the Commissioner. Sec. 7491(a). The parties disagree as to whether petitioners have met the requirements to shift the burden of proof to respondent. Because we do not decide this case by reference to the placement of the burden of proof, we need not and do not decide whether petitioners have met the requirements under section 7491(a) to shift the burden of proof to respondent.

C.  *Taxation of Property Distributions Under Section 402(a)*

Section 402(a) provides:

Except as otherwise provided in this section, any amount actually distributed to any distributee by an employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to the distributee, in the taxable year of the distributee in which distributed, under section 72 (relating to annuities).

The regulations under section 402(a) provide generally that "distribution of property * * * shall be taken into account by the distributee at its fair market value." Sec. 1.402(a)–1(a)(1)(iii), Income Tax Regs. The section 402(a) regulations as in existence before amendment in 2005 (hereinafter, the applicable regulations) provide special rules that apply when a tax-exempt employees' trust described in section 401(a) (such as the profit-sharing plan) purchases for and distributes to an employee an annuity contract that contains a "cash surrender value" which may be available to the employee by surrendering the contract. Sec. 1.402(a)–1(a)(2), Income Tax Regs. In such circumstances, the "cash surrender value" will not be considered income until the contract is surrendered. *Id.* These special rules also provide that if the distributed contract is a life insurance contract and the distribution occurs after 1962, then (subject to an exception not relevant to this discussion) the "entire cash value" of the contract is includable in the distributee's gross income. *Id.* The applicable regulations do not define the terms "fair market value", "cash surrender value", or "entire cash value". Nor do these regulations expressly address the tax treatment of a bargain sale from a qualified plan to a plan participant.

On February 13, 2004, the IRS sought to clarify these matters when it proposed amendments to the section 402(a) regulations. See Notice of Proposed Rulemaking and Notice of Public Hearing, 69 Fed. Reg. 7385 (Feb. 17, 2004), which states: "The current regulations do not define 'fair market value' or 'entire cash value' and questions have arisen regarding the interaction between these two provisions and whether 'entire cash value' includes a reduction for surrender charges." This notice explains that the proposed amendments were intended to clarify that "the requirement that a distribution of property must be included in the distributee's income at fair market value is controlling in those situations

where the existing regulations provide for the inclusion of the entire cash value." *Id.* The proposed regulations also provided that if a qualified plan transfers property to a plan participant for consideration that is less than the property's fair market value, the transfer will be treated as a distribution by the plan to the participant to the extent the property's fair market value exceeds the amount received in exchange. *Id.* at 7386. Consequently, under the proposed regulations, any "bargain element" in the sale is treated as a distribution under section 402(a). *Id.*

The amended regulations, as made final on August 29, 2005, are effective as of that date. T.D. 9223, 2005–2 C.B. 591. The amended regulations also provide that if a qualified plan transfers a life insurance contract (among various other types of property) to a plan participant or beneficiary before August 29, 2005, the excess of the fair market value of the contract over the value of the consideration received by the trust is includable in the participant's or beneficiary's gross income under section 61, but the transfer "is not treated as a distribution for purposes of applying the requirements of subchapter D of chapter 1 of subtitle A of the Internal Revenue Code", which contains sections 401 through 424. Sec. 1.402(a)–1(a)(1)(iii), Income Tax Regs.

## D. *Applicability of the Amended Regulations*

In his opening brief respondent states that the new rules in the amended section 402(a) regulations "do not apply in this case". On supplemental brief (in response to the Court's inquiry) respondent clarifies his position by stating that the amended regulations apply in this case to the extent that they "clarify" the law as it applied during taxable year 2000 with respect to transfers of property occurring before August 29, 2005. [4]

---

[4] On supplemental brief respondent states that the amended sec. 402(a) regulations are inapplicable to this case to the extent that they changed the law effective as of Aug. 29, 2005. Respondent states:

Respondent notes that whether the transfer was or was not a distribution for purposes of the requirements of Subchapter D is not at issue in this case. Because Treas. Reg. § 1.402(a)–1(a)(1)(iii) as amended provides that the excess of the fair market value of the property transferred by the trust over the value of the consideration received by the trust is includible in the gross income of the participant or beneficiary under section 61, the fact that the transfer did not represent a distribution for purposes of the requirements under Subchapter D is irrelevant to the resolution of this case.

Without expressly challenging the validity of the amended regulations, on supplemental brief petitioners suggest that the amended regulations as applicable to pre-August 29, 2005, transfers should not be construed to effect a retroactive change in the law. Petitioners contend that "for purposes of the sale of the policy and the determination of any income related thereto, the policy valuation must be determined on the basis of statutory and regulatory guidance and case precedent in existence at the time of such sale and IRC § 402 is not the sole determinative provision for such determination."

Insofar as the parties have any disagreement about the applicability of the amended section 402(a) regulations, then, it would appear to be a fairly nuanced disagreement as to whether the amended regulations correctly "clarified" the law in existence at the time of the transfer in question, in particular as pertains to: (1) The taxation under section 61 of a bargain sale of a life insurance policy from a qualified plan to a plan beneficiary; and (2) the proper standard for valuing the life insurance policy. We address each of these issues in turn.

E. *Bargain Sale of the Life Insurance Policy*

Section 61(a) provides that gross income includes "all income from whatever source derived". It is well established that income may result from a bargain sale when the parties have a special relationship such as stockholders or employees. For instance, in *Commissioner v. LoBue*, 351 U.S. 243, 248 (1956), the Supreme Court observed that although "our taxing system has ordinarily treated an arm's length purchase of property even at a bargain price as giving rise to no taxable gain in the year of purchase * * * that is not to say that when a transfer which is in reality compensation is given the form of a purchase the Government cannot tax the gain". In *LoBue*, the Supreme Court held that a taxpayer realized taxable gain when he exercised an option to purchase stock from his employer at less than fair market value pursuant to an arrangement that "was not an arm's length transaction between strangers. Instead it was an arrangement by which an employer transferred valuable property to his employees in recognition of their services." *Id.*; see also

*Commissioner v. Smith*, 324 U.S. 177 (1945) (holding that the bargain element of an employer's bargain sale of stock to an employee represented taxable income to the employee); *Lowndes v. United States*, 384 F.2d 635 (4th Cir. 1967); *Haag v. Commissioner*, 40 T.C. 488 (1963), affd. 334 F.2d 351 (8th Cir. 1964); *Waldheim v. Commissioner*, 25 T.C. 839, 850–851 (1956), affd. 244 F.2d 1 (7th Cir. 1957); *Strake Trust v. Commissioner*, 1 T.C. 1131 (1943).

The transfer from the profit-sharing plan to petitioner was pursuant to a prearranged plan for him to use IRA funds to buy life insurance through the profit-sharing plan, which was established for this purpose and with the expectation that it would shortly thereafter distribute the policy to petitioner. Insofar as the record reveals, the transaction was in no sense arm's length. There is no suggestion of any negotiations between the profit-sharing plan (whose sole trustees were petitioners) and petitioner as to the amount of the consideration he paid for the insurance policy. Rather, the price appears to have been set by petitioners' advisers in furtherance of the so-called PAT plan with the objective of minimizing petitioners' taxes on the transfer of the insurance policy to petitioner.

We conclude that insofar as petitioner purchased the life insurance policy from the profit-sharing plan at a bargain price, the bargain element is includable in his gross income pursuant to section 61. [5] The amount, if any, of the bargain element depends upon the value properly assigned to the insurance policy. We turn to that issue.

## F.  *Valuation of the Life Insurance Policy*

Respondent suggests that the amended section 402(a) regulations, as applicable to pre-August 29, 2005, transfers, reflect the "fair market value" standard as contained in the applicable regulations before amendment in 2005. See sec. 1.402(a)–1(a)(1)(iii), Income Tax Regs. Citing cases involving valuation of insurance policies for purposes of applying the gift tax, see *Guggenheim v. Rasquin*, 312 U.S. 254 (1941), or

---

[5] We find it unnecessary to decide whether any bargain element might also be characterized as an "amount actually distributed" within the meaning of sec. 402(a) and thus taxable to the distributee under sec. 72. Treating the bargain element as a distribution under sec. 402(a) might well entail collateral consequences; for instance, it might affect qualification of the trust under sec. 401(a). It would appear that the amended sec. 402(a) regulations were designed to provide dispensation from such collateral consequences, at least for pre-Aug. 29, 2005, transfers.

for purposes of determining taxable gain on the exchange of property, see *Parsons v. Commissioner*, 16 T.C. 256, 261 (1951), respondent contends that under general principles the fair market value of the insurance contract should be determined by reference to total policy reserves.[6] Respondent contends that under these principles the fair market value of the life insurance policy, as of the date of its transfer to petitioner, was $1,368,327.33. We agree with respondent's bottom line but arrive there by a somewhat different route.

Valuation of the life insurance policy under the applicable regulations must take into account, we believe, the special rules thereunder that generally require the "entire cash value" of a life insurance contract to be included in the distributee's gross income. Sec. 1.402(a)–1(a)(2), Income Tax Regs. The regulations do not define "entire cash value".[7] When originally proposed in 1955, the section 402(a) regulations referred to the "entire value of such contract". Sec. 1.402(a)–1(a)(2), Proposed Income Tax Regs., 20 Fed. Reg. 6460 (Sept. 1, 1955). That term might plausibly be construed as synonymous with "fair market value". When the proposed regulations were finalized in 1956, however, the term was

---

[6] Similarly, citing Notice 89–25, Q&A–10, 1989–1 C.B. 662, 665, respondent argues that the life insurance policy should be valued by reference to total policy reserves. Notice 89–25, Q&A–10, states that in determining gross income under sec. 402(a) from the distribution of an insurance contract by a qualified plan, individuals "use the stated cash surrender value" but that this practice is not appropriate where the total policy reserves together with any reserves for advance premiums, accumulations, etc., "represent a much more accurate approximation of the fair market value of the policy than does the policy's stated cash surrender value." *Id.* Notice 89–25, Q&A–10, illustrates these principles with an example of a life insurance policy with a low initial cash surrender value that increases dramatically after a specified period to become greater than the aggregate premiums. On brief the parties argue at length as to whether the insurance policy at issue in this case represents the same type of "springing policy" described in this example. In the light of our holding today, we need not address this issue or otherwise opine on the potential application of Notice 89–25, Q&A–10, in other circumstances or, more generally, on the degree of deference that might be owed to Notice 89–25, *supra*. Cf. *Taproot Admin. Servs., Inc., v. Commissioner*, 133 T.C. 202, 209 n.16 (2009) (stating that the various types of pronouncements issued by the Department of the Treasury and the Internal Revenue Service warrant "varying levels of judicial deference").

[7] "Cash value" is a general concept relevant to whole (permanent) life insurance policies. As the insured gets older, premiums remain constant but mortality costs increase. The premiums in the early years are greater than the mortality costs and the excess premium creates a policy "reserve" that covers the shortfall in later years. If the policy owner surrenders the policy, the insurance company can release the reserve to the policy owner. The policy builds cash value as a direct result of the reserve. The "cash value" increases every year but grows slowly in the early years in part because in the early years the insurer recovers the costs of commissions, underwriting, and other administrative expenses. If the policy owner surrenders the policy, he or she receives the "net cash surrender value", which is the "gross cash value" minus surrender charges, adjusted for certain other amounts. See Zaritsky & Leimberg, Tax Planning With Life Insurance: Analysis With Forms, pars. 1.02(3)(c), 1.03(1) (2d ed. 2009).

changed to "entire cash value" of the contract. Sec. 1.402(a)–1(a)(2), Income Tax Regs., T.D. 6203, 1956–2 C.B. 219, 235. With this change it appears that the regulations purposefully departed from a generalized valuation standard ("entire value of such contract") in favor of a more particularized (and possibly more objective and more easily administered) valuation standard ("entire cash value of such contract").

Section 402(a) provides that distributions to which it applies are taxable under the rules of section 72. See sec. 1.402(a)–1(a)(1)(ii), Income Tax Regs. Section 72(e) prescribes the tax treatment of any amount received under an annuity, endowment, or life insurance contract that is not received as an annuity. As a general rule, any nonannuity amount received before the annuity starting date is includable in gross income to the extent allocable to income on the contract. Sec. 72(e)(2)(B).[8] Under this general rule, the amount allocable to income on the contract is determined by reference to the "cash value of the contract (determined without regard to any surrender charge)". Sec. 72(e)(3)(A)(i). Similarly, for purposes of defining life insurance contracts, section 7702(f)(2)(A) defines the "cash surrender value" of a life insurance contract as the "cash value determined without regard to any surrender charge". The Code distinguishes "cash surrender value" from "net surrender value", which is determined "with regard to surrender charges". See sec. 7702(f)(2)(B).

Particularly in the light of the express cross-references between sections 72 and 402 and the applicable regulations, we believe that the term "cash value" is properly construed consistently under these various provisions to refer to cash value determined without regard to any surrender charge.[9]

---

[8] Sec. 72(e)(5) generally supersedes the applicability of sec. 72(e)(2)(B) with respect to life insurance contracts and endowment contracts (other than modified endowment contracts). Sec. 72(e)(5)(A), (C), (10). For these contracts, any amount not received as an annuity is generally included in gross income to the extent it exceeds the investment in the contract. Sec. 72(e)(5)(A) (flush language). Notwithstanding these provisions of sec. 72(e)(5), however, in the case of nonannuity amounts received from, among other things, a trust (such as the profit-sharing plan in this case) that is described in sec. 401(a) and is exempt from tax under sec. 501(a), the general rule of sec. 72(e)(2)(B) is applicable. Sec. 72(e)(8).

[9] In reaching this conclusion, we are mindful that in *Guggenheim v. Rasquin*, 312 U.S. 254, 256 (1941), the Supreme Court stated that "Cash-surrender value is the reserve less a surrender charge." As discussed *supra*, however, *Guggenheim* involved valuation of insurance policies for gift tax purposes and did not entail application of the rules under sec. 72(e) or sec. 402(a). The relevant provisions of sec. 72(e) were enacted in 1982 as part of the Tax Equity and Fiscal Re-

Continued

Moreover, we do not believe that the appearance of the adjective "entire" before the words "cash value" in the applicable regulations can sensibly be read to connote any lesser value than "cash value" under section 72(e)(3)(A) or "cash surrender value" under section 7702(f)(2)(A).

According to Hartford Life, on the date of the transfer from the profit-sharing plan to petitioner, the cash value of the insurance policy was $305,866.74 after taking into account a $1,062,460.59 surrender charge. Accordingly, without reduction for the surrender charge, the entire cash value of the insurance policy for purposes of section 402(a) was $1,368,327.33—the same amount that respondent asserts as the policy's fair market value.

A valuation of $1,368,327.33 is strongly supported by the fact that Hartford Life credited the trust with a $1,368,327.33 premium payment on the exchange of the insurance policy on January 12, 2001, 2 weeks after the profit-sharing plan transferred the insurance policy to petitioner.

The authorities petitioners cite do not compel any different result. In particular, petitioners rely upon regulations under section 83, which provide that "In the case of a transfer of a life insurance contract * * * only the cash surrender value of the contract is considered to be property" for purposes of section 83. Sec. 1.83–3(e), Income Tax Regs. Section 83 and the regulations thereunder are by their terms inapplicable to the transaction in question. [10] But even by analogy, these regulations are not helpful to petitioners since, as just discussed, section 7702(f)(2)(A) defines cash surrender value as allowing no reduction for surrender charges. [11]

---

sponsibility Act of 1982, Pub. L. 97–248, sec. 265, 96 Stat. 544. These amendments were intended to discourage the use of deferred annuity contracts for short-term investment and income tax deferral. See Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Tax Equity and Fiscal Responsibility Act of 1982, at 361 (J. Comm. Print 1982). Sec. 7702 was enacted in 1984 as part of the Deficit Reduction Act of 1984, Pub. L. 98–369, sec. 221(a), 98 Stat. 767. Although these statutory amendments postdate the promulgation of the applicable regulations in 1956, for the reasons discussed *supra* we believe that the cross-reference to sec. 72 in sec. 402(a), in particular, counsels that the applicable regulations be construed in a manner that is consonant with these subsequent statutory provisions.

[10] Sec. 83 governs transfers of property in connection with the performance of services. Sec. 83 does not apply to transfers to or from a trust described in sec. 401(a), such as the profit-sharing plan. Sec. 83(e)(2).

[11] For similar reasons, petitioners' reliance upon Prohibited Transaction Exemption 77–8 (PTE 77–8), 1977–2 C.B. 425, is misplaced. PTE 77–8 granted an exemption from the prohibited transaction rules under tit. I of the Employee Retirement Income Security Act of 1974 and sec. 4975 for, among other transactions, the sale of a life insurance policy by a plan to a plan partici-

Relying on Rev. Rul. 59–195, 1959–1 C.B. 18, petitioners argue that the interpolated terminal reserve value is the proper method of valuing the insurance policy. This revenue ruling concluded that when an employer purchases and pays premiums on an insurance policy on the life of an employee and later sells the policy to the employee when further premiums must be paid, the value of the policy for purposes of computing taxable gain to the employee is the "interpolated terminal reserve value" as of the date of sale. *Id.* We are not convinced that Rev. Rul. 59–195, *supra*, displaces the provisions of the applicable regulations that look to the "entire cash value" of the insurance contract. In any event, the evidence does not persuade us that the interpolated terminal reserve value of the insurance policy was in fact only $305,866.74, as petitioners assert. [12]

In sum, we conclude and hold that petitioner paid the profit-sharing plan $1,053,304 less for the life insurance policy than its $1,368,327.33 value as of the date of the transfer and that this bargain element is includable in petitioners' gross income pursuant to section 61.

_____

pant in certain situations. If the conditions of the exemption are met, the exemption allows the plan participant to purchase the insurance policy from the profit-sharing plan at its cash surrender value. One condition is that "the contract would, but for the sale, be surrendered by the plan". 1977–2 C.B. at 428. The record does not show that this condition was met. More fundamentally, as just discussed, cash surrender value, as defined under sec. 7702(f)(2), does not include any reduction for surrender charges. Moreover, PTE 77–8 specifically states that "for Federal income tax purposes, a purchase of an insurance policy at its cash surrender value may be a purchase of property for less than its fair market value. The Federal income tax consequences of such a bargain purchase must be determined in accordance with generally applicable Federal income tax rules." 1977–2 C.B. at 427.

[12] The interpolated terminal reserve "is not cash surrender value; it is the reserve which the insurance company enters on its books against its liability on the contracts. * * * The word 'interpolated' simply indicates adjustment of the reserve to the specific date in question." *Commissioner v. Edwards*, 135 F.2d 574, 576 (7th Cir. 1943) (valuing a gift of annuity contracts under a regulation that allowed the interpolated terminal reserve value to be used as an approximation), affg. 46 B.T.A. 815 (1942). Attempting to establish the interpolated terminal reserve value of the insurance policy, petitioners rely on a one-page document from Hartford Life dated Dec. 21, 2000, captioned "INTERPOLATED TERMINAL RESERVE AS OF DECEMBER 15, 2000, DATE OF QUOTE CALCULATION DECEMBER 21, 2000". Without ever again using the term "interpolated terminal reserve", this document indicates: (1) That the prior yearend reserve was zero; (2) that the yearend reserve as of Jan. 12, 2001, was $305,866.76; and (3) that the "Annual Reserve Increase" was $305,866.76. Petitioners' own brief indicates that at the end of policy year 2, Hartford Life's reserves in the insurance policy were $1,035,030. Petitioners have offered no explanation why the interpolated terminal reserve value was purportedly only $305,866.74 in the light of their representation that Hartford Life maintained a reserve of $1,035,030.

G. *Accuracy-Related Penalty for Negligence*

Section 6662(a) and (b)(1) imposes a 20-percent penalty on any portion of an underpayment that is attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the Code; the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Allen v. Commissioner*, 92 T.C. 1, 12 (1989), affd. 925 F.2d 348 (9th Cir. 1991); *Neely v. Commissioner*, 85 T.C. 934, 947 (1985).

A return that has a "reasonable basis" is not negligent. Sec. 1.6662–3(b)(1), Income Tax Regs. The "reasonable basis" standard is "significantly higher than not frivolous or not patently improper." Sec. 1.6662–3(b)(3), Income Tax Regs. This standard is satisfied if the return position is reasonably based on various types of enumerated authorities, including statutory provisions, regulations, revenue rulings, and notices published by the IRS, taking into account the relevance and persuasiveness of the authorities and subsequent developments. Secs. 1.6662–3(b)(3), 1.6662–4(d)(3)(iii), Income Tax Regs. The "reasonable basis" standard is less stringent than the "substantial authority" standard (which entails "an objective standard involving an analysis of the law and application of the law to relevant facts"), which in turn is less stringent than the "more likely than not standard" (which asks whether there is "a greater than 50-percent likelihood of the position being upheld"). Secs. 1.6662–3(b)(3), 1.6662–4(d)(2), Income Tax Regs. The negligence penalty may be inappropriate where an issue to be resolved by the Court is one of first impression involving unclear statutory language. *Bunney v. Commissioner*, 114 T.C. 259, 266 (2000); *Lemishow v. Commissioner*, 110 T.C. 110, 114 (1998); *Hitchins v. Commissioner*, 103 T.C. 711, 719–720 (1994); see *Everson v. United States*, 108 F.3d 234, 238 (9th Cir. 1997) (stating that "When a legal issue is unsettled, or is reasonably debatable" a negligence penalty is generally not appropriate).

This Court has not previously addressed the tax treatment of a bargain sale of a life insurance policy under section 61

or 402(a) or the application of the "entire cash value" standard under the applicable regulations. In adopting the 2005 final section 402(a) regulations, the IRS stated that it was responding to the question under the then-existing regulations of whether "entire cash value" includes a reduction for surrender charges. T.D. 9223, 2005–2 C.B. 591. Furthermore, the amended section 402(a) regulations, which dispense with the "entire cash value" standard, indicate that for a bargain sale of an insurance contract that occurs before August 29, 2005, the bargain element is includable in income under section 61 but is not treated as a "distribution" under the subchapter of the Code that includes section 402. Sec. 1.402(a)–1(a)(1)(iii), Income Tax Regs. On supplemental brief respondent has modified his original position as to the applicability of this amended regulation. Respondent's shift in this regard, together with his explanation of his reasons for promulgating the amended section 402(a) regulations, is indicative of the uncertainty under the applicable regulations of the tax consequences of the transaction in question. We conclude that petitioners had a reasonable basis for their return position. [13] We hold that petitioners are not liable for the accuracy-related penalty for negligence.

Other contentions raised by the parties but not addressed in this Opinion we deem to be moot or without merit. [14]

---

[13] Notice 89–25, Q&A–10, states ambiguously that individuals who receive an insurance policy as a distribution from a qualified plan "use the stated cash surrender value" for purposes of determining the amount includable in their gross income under sec. 402(a), but that this practice is not appropriate where the total policy reserves "represent a much more accurate approximation of the fair market value". We believe that petitioners had a reasonable basis for differentiating the insurance policy in question in this case from the type of "springing policy" discussed in Notice 89–25, Q&A–10, and consequently for concluding that they could use the "stated cash surrender value" to value the insurance policy.

[14] For the first time, in their reply brief petitioners argue that they are entitled to a waiver of interest. As a general rule, this Court will not consider issues first asserted on brief. See *Sundstrand Corp. & Subs. v. Commissioner*, 96 T.C. 226, 346–349 (1991). When issues are presented in the reply brief only, there is even stronger reason to disregard them. See *Estate of Sparling v. Commissioner*, 60 T.C. 330, 350 (1973), revd. on another issue 552 F.2d 1340 (9th Cir. 1977). In any event, petitioners have not alleged and the record does not suggest that respondent has made any final determination not to abate interest that this Court would have jurisdiction to review pursuant to sec. 6404(h).

To reflect the foregoing and concessions by respondent,

*An appropriate decision will be entered*.