**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL P. SCHWAB; KATHRYN J. KLEINMAN, *Petitioners-Appellees*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellant*. | No. 11-71957 <br><br> Tax Ct. No. 10525-07 <br><br> OPINION |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
February 15, 2013—San Francisco, California

Filed April 24, 2013

Before: Michael Daly Hawkins and Milan D. Smith, Jr.,
Circuit Judges, and James G. Carr, District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable James G. Carr, Senior District Judge for the U.S. District Court for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Tax

The panel affirmed the tax court's partial grant of a petition by taxpayers challenging the Commissioner of Internal Revenue's determination of a deficiency in their federal income tax.

Taxpayers each purchased a variable universal life insurance policy that was subject to surrender charges (fees that taxpayers would incur if the policies were terminated prior to a contractually specified date). The distribution of taxpayers' policies to them was a taxable event, for which the Commissioner contended that the full stated policy values must be treated as income, even though the net cash surrender values were negative. The panel held that the "amount actually distributed" when taxpayers received ownership of the life insurance policies was "the fair market value of what was actually distributed," and that surrender charges associated with a variable universal life insurance policy may be considered as part of the general inquiry into a policy's fair market value.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Teresa E. McLaughlin (argued), Tamara W. Ashford, and Damon W. Taaffe, Tax Division, Department of Justice, for Appellant.

Jay R. Weill (argued), Sideman & Bancroft LLP, San Francisco, California, for Appellee.

## OPINION

M. SMITH, Circuit Judge:

The tax court determined that the "amount actually distributed"[1] when a couple received ownership of two life insurance policies after their employer wound down their employees' benefit trust was "the fair market value of what was actually distributed." *Schwab v. Comm'r.*, 136 T.C. 120, 131 (2011). It further held that surrender charges associated with a variable universal life insurance policy may permissibly be considered as part of the general inquiry into a policy's fair market value. *Id.* at 134. We agree with the tax court on both determinations, and we affirm.

## BACKGROUND

Michael Schwab and Kathryn Kleinman, a married couple, are employees and the sole shareholders of Angels & Cowboys, Inc. Schwab works as a graphic designer and Kleinman is a photographer.

---

[1] Internal Revenue Code § 402(b)(2). The Internal Revenue Code is referred to hereafter as I.R.C., tax code, or code.

On the advice of their accountant, Schwab and Kleinman each purchased a variable universal life insurance policy through Angels & Cowboys. The policies were held in a multiple-employer welfare benefit trust administered by a third party company as part of a nonqualified employee benefit plan.[2] The plan was "aimed at small-business owners" and was, according to its promotional materials, designed to allow "qualified professionals, entrepreneurs, and closely-held business owners to obtain life insurance for themselves and for key employees on a tax-deductible basis." *Schwab*, 136 T.C. at 122.

The tax court provides a succinct description of the policies Schwab and Kleinman purchased:

> The policies were of a type called variable universal life, a relatively new type of contract for this old industry. A key characteristic of universal life-insurance policies is that they disconnect to some degree a life-insurance feature (i.e., payment of money upon death) from an investment feature (i.e., the use of premiums to acquire assets that fund the insurance payment). The insurer selling a universal-life policy typically

---

[2] "Such plans come in 'qualified' and 'nonqualified' varieties. Qualified plans must meet the requirements of [I.R.C.] section 401, and all the complicated regulations governing their funding, nondiscriminatory terms, employee coverage, distribution, and other requirements. Meeting such requirements allows for favorable tax treatment of qualified plans, but not all plans can comply; hence the existence of nonqualified plans. Nonqualified plans are generally subject to fewer statutory and regulatory requirements, but they also receive less favorable tax treatment." *Schwab*, 136 T.C. at 126–27.

segregates payments from its customers in separate investment accounts from which it makes deductions to pay for the insurance component of the policy. At death, the customer's beneficiary gets what's left in the separate account. Under a *variable* universal life-insurance contract, the customer typically can choose from a menu of different investments (often set up to closely resemble mutual funds) with varying returns and thus varying payouts upon death, though there is (as was true under the contracts here) a minimum death-benefit guaranty.

*Id.* at 124. Two provisions of the insurance policies are particularly relevant to this case. First, the policies were subject to surrender charges—the primary focus of the Commissioner of Internal Revenue's (Commissioner) concern on appeal. The surrender charge in this case is the fee that Schwab and Kleinman would incur if they allowed their policies to lapse, or otherwise terminated them, prior to a contractually specified date. The surrender charges on Schwab and Kleinman's policies "lasted eleven years and would be reduced by 20 percent a year only in years 8–12 (starting in 2008)." *Id.* at 125.

Another salient feature of the policies was the no-lapse provision present in each of them. That provision specified that the policy would not lapse in the first three years of coverage, provided that the sum of all premiums paid was "greater than the no lapse premium multiplied by the number of months the policy has been in force, . . . even if the net cash surrender value is zero or less." *Id.* at 124.

Two values associated with the policies are also pertinent to this case. The first is the "policy value," which the plan documents define as "premiums less policy loads, plus net investment return, less policy charges, partial surrenders, and any indebtedness." *Id.* at 123. The second is the net cash surrender value, which is a standard industry term, and is the stated policy value minus the applicable surrender charge. The net cash surrender value represents the sum of money the insurance company will pay to the policyholder should he allow the policy to lapse or voluntarily terminate the policy before his death.

Angels & Cowboys paid the initial premiums on the policies, which were originally more than $136,000 per year for Schwab's policy, and $120,000 for Kleinman's. Both Schwab and Kleinman elected to invest their premium payments in funds whose value was tied to the value of the Standard & Poor's 500 index. Had Schwab and Kleinman's expectations been met, they would eventually have been able to stop paying premiums on their policies because the premiums would have been covered by the returns on their investments. Unfortunately for Schwab and Kleinman, their investment hopes were dashed. During "the three-year period beginning in September 2000 . . . [t]he S & P 500 index declined nearly 34 percent," *Schwab*, 136 T.C. at 125 n.9, and their policy values dropped by a similar percentage.

Meanwhile, the Internal Revenue Service (IRS) began more aggressively asserting its position that the type of employee-benefit plan in which Angels & Cowboys was participating was not entitled to receive the favorable tax treatment that was the plan's entire *raison d'être*. "By 2003 it became clear that the Treasury Department would adopt . . . regulations" with which that employee-benefit plan would be

unable to comply. *Id.* at 123. Anticipating what would soon occur, the plan's administrator terminated the plan, and in October 2003, Schwab and Kleinman took ownership of their respective policies.

The relevant policy values at the time of their distribution are summarized below:[3]

|                           | *Schwab* | *Kleinman* |
|---------------------------|----------|------------|
| Stated policy value       | $48,667  | $32,576    |
| Surrender charges         | 49,225   | 46,599     |
| Net cash surrender value  | (558)    | (14,023)   |

From the date of the distribution, Schwab's policy was set to lapse within 54 days, and Kleinman's would lapse in 24 days. Accordingly, unless the Standard & Poor's 500 Index surged in that time period, the negative net cash surrender values of the policies made clear that Schwab and Kleinman would receive nothing if their policies lapsed. Thus, Schwab and Kleinman had a choice: they could continue paying premiums on their respective policies, and thus continue their coverage, or they could allow their respective policies to lapse, and potentially receive nothing. Kleinman allowed her policy, which remained far "in the red," to lapse rather than pay the $108,031 premium. By contrast, the policy value of Schwab's policy rebounded modestly, and Schwab decided for a time to continue paying the required premiums, and keep his policy in force.

---

[3] The table is reproduced from *Schwab*, 136 T.C. at 125.

The distribution of the policies from the trust to Schwab and Kleinman was a taxable event under I.R.C. § 402(b)(2), which provides for the taxation of assets distributed from a nonqualified employees' trust, such as the one in which Angels & Cowboys participated. Believing they were only required to pay taxes on the net cash surrender values of their policies—which were negative at the time of the taxable event—Schwab and Kleinman did not report any taxable income as result of the distribution of their policies.[4] The Commissioner disagreed with Schwab and Kleinman's tax treatment of their policy distributions, maintaining that the full stated policy values must be treated as income. He issued a notice of deficiency to Schwab and Kleinman.

Schwab and Kleinman petitioned the tax court, arguing that they "actually received" nothing of value and therefore should pay no taxes on the distribution. The Commissioner asserted that surrender charges may *never* be considered under section 402(b), and maintained that Schwab and Kleinman actually received the full stated policy values of their respective insurance policies. In a decision it later characterized as "[coming] down in the middle," the tax court read "section 402(b) to say that a court could consider [surrender charges], but only as part of a more general inquiry into a policy's fair market value."[5] In Schwab and Kleinman's case, the tax court accounted for surrender

---

[4] The tax court found that "Schwab and Kleinman made a reasonable attempt to comply with the provisions of the Code" and that they relied on multiple representations made by their accountants and the administrator of the trust. *Schwab*, 136 T.C. at 126, 136.

[5] Order, *Schwab v. Comm'r*, March 22, 2011, Docket No. 10525-07. (hereinafter, Order Denying Reconsideration).

charges, and held that the only taxable value the policies had at the time of distribution was "the small amount of the insurance coverage that was attributable to the single premium that Angels & Cowboys had paid on each policy some three years earlier." *Id.* at 135. The Commissioner timely appealed to our court. We have jurisdiction under I.R.C. § 7482.

## STANDARD OF REVIEW

"A tax court's conclusions of law and construction of the Internal Revenue Code are reviewed de novo." *Estate of Rapp v. Comm'r*, 140 F.3d 1211, 1215 (9th Cir. 1998) (internal citation omitted). The facts of this case are undisputed, and the Commissioner appeals only questions of law.

## DISCUSSION

### A.

Schwab and Kleinman received two insurance contracts from a nonqualified employees' trust. The distribution from that trust is taxed according to section 402(b)(2) of the tax code, which reads in relevant part:

> The amount actually distributed or made available to any distributee by any trust described in paragraph (1) shall be taxable to the distributee, in the taxable year in which so distributed or made available, under section 72 (relating to annuities) . . . .

The application of section 402(b)(2) to Schwab's and Kleinman's policies presents a quandary. The word "amount" implies a quantifiable sum.[6] But Schwab and Kleinman did not receive an "amount"; they received their respective life insurance policies. The tax court resolved the tension between the language of section 402(b)(2) and its application to the Schwab-Kleinman policies by holding that "the 'amount actually distributed' means the fair market value of what was actually distributed." *Schwab*, 136 T.C. at 131. That holding necessitates a two-step analysis. First, the court had to determine the fair market value of Schwab and Kleinman's life insurance policies, and then it was required to determine the appropriate tax on *that* amount under section 72.

The Commissioner strenuously disagrees with the tax court's conclusion. The gravamen of his argument is that surrender charges may never be considered when determining the "amount actually received" from an employees' trust under section 402(b)(2). To evaluate the Commissioner's argument, we first ascertain whether the tax code and its accompanying regulations forbid the consideration of surrender charges under section 402(b)(2), as the Commissioner contends. Second, we determine whether the tax court correctly held that the "amount actually received" means "the fair market value of what was actually received," and if so, whether surrender charges may ever affect the fair market value of a variable universal life insurance policy.

---

[6] *See, e.g.*, Webster's Third New Int'l Dictionary (defining "amount" as "the total number or quantity").

**B.**

The Commissioner commences his argument with the text of section 402(b)(2) itself. He contends that because the "amount actually distributed . . . shall be taxable to the distributee . . . under section 72 (relating to annuities)," and because section 72 contemplates the "cash value" of a non-annuity "without regard to any surrender charge," I.R.C. § 72(e)(3)(A)(i), then section 402(b)(2) must also apply without regard to any surrender charge. As the Commissioner phrased it in his brief, under section 402(b)(2), "[life insurance] policies are to be valued in the same manner as they would be under § 72(e)(3)(A)." The tax court, he urges, therefore erred by supplanting a fair market valuation standard in place of the statutorily-mandated methodology supplied by § 72(e)(3)(A).

> Section 72(e)(3)(A) reads as follows:
>
> Any amount to which this subsection applies shall be treated as allocable to income on the contract to the extent that such amount does not exceed the excess (if any) of —
>
> (i) the cash value of the contract (determined without regard to any surrender charge) immediately before the amount is received, over
>
> (ii) the investment in the contract at the time.

The Commissioner relies upon subsection (i), which explains that for purposes of section 72, the cash value of the contract

is to be determined without regard to any surrender charge. Thus, the Commissioner contends, Schwab and Kleinman must pay taxes on the stated policy values.  But he misses a step.  The Commissioner offers no reason to believe that the "cash value" of the policy under section 72(e)(3)(A) is the "amount actually received" under section 402(b)(2).[7]  Nor is section 72(e)(3)(A) a freestanding method for valuing life insurance policies.  Rather, in this context it is "a guide to allocating that value between taxable income and nontaxable return of the investment on the contract."[8]  The title of paragraph (e)(3) is, after all, "Allocation of amounts to income and investment." And paragraph (i) simply sets forth the method for computing one of the two numbers in that formula.

The other problem with the Commissioner's interpretation of section 402(b)(2) is that it reads the phrase "amount actually distributed or made available" entirely out of section 402(b)(2).  *See Beisler v. Comm'r*, 814 F.2d 1304, 1307 (9th Cir. 1987) ("We should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress.").  The Commissioner's assertion that section 72(e)(3)(A)(i) dictates how insurance policies distributed from nonqualified trusts should be taxed completely bypasses the reference in section 402(b)(2) to the "amount actually distributed."  In contrast, the tax court's interpretation of the interplay of sections 402(b)(2) and 72(e)(3)(A)(i) gives effect to all of the language in both statutory provisions.  Under that interpretation, the "amount to which this subsection applies" in subsection 72(e)(3)(A)(i)

---

[7] We discuss this further in Part D, *infra*.

[8] Order Denying Reconsideration at 2.

is the "amount actually distributed" in section 402(b)(2). We thus conclude that the tax court advances the better interpretation of the plain text of section 402(b)(2).

## C.

This is not the end of our inquiry, however. Section 402 is the subject of a number of Treasury regulations, and, as a general matter, "we defer to the Treasury's interpretation of the statute" if the applicable regulations prove dispositive. *See Pac. First Fed. Sav. Bank v. Comm'r*, 961 F.2d 800, 805 (9th Cir. 1992) (citing *Nat'l Muffler Dealers Ass'n, Inc. v. United States*, 440 U.S. 472, 488 (1979)).

As a result, the Commissioner appeals for support beyond the text of section 402(b)(2). He first argues that the Treasury regulation interpreting section 402(b), Treas. Reg. § 1.402(b)–1, supports his interpretation of that section. The Commissioner directs our attention to an example in that regulation, which reads as follows: "If, for example, the distribution from such a trust consists of an annuity contract, the amount of the distribution shall be considered to be the entire value of the contract at the time of distribution." Treas. Reg. § 1.402(b)–1(c).[9] We first note, as did the tax court, that the example refers to annuity contracts, rather than life insurance policies. Nonetheless, the Commissioner focuses upon the phrase "entire value of the contract," arguing that such language "draws upon" the Supreme Court's reasoning in a trio of cases (all delivered the same day), in which the Court considered "the proper method for valuation" of a

---

[9] Unless otherwise stated, all references herein to Treasury regulations refer to the version that was current when Schwab and Kleinman filed their tax returns.

single-premium life insurance policy for gift tax purposes. *See, e.g.*, *Guggenheim v. Rasquin*, 312 U.S. 254, 255 (1941). In *Guggenheim*, the Court held that the fair market value of the policy[10] was not its cash surrender value, but rather the purchase price, because "[c]ost is cogent evidence of value" when the purchaser assigned the policy to three of her children at "substantially the same time" as the purchase. *Id.* at 256, 258; *see also Powers v. Comm'r*, 312 U.S. 259 (1941) (affirming same). By contrast, in *United States v. Ryerson*, 312 U.S. 260 (1941), five years had elapsed between the purchase of the policy and its assignment. The Court therefore held that the replacement cost of the policy at that time of the assignment, rather than the policy's original purchase price, was the correct valuation of the policy for gift tax purposes. *Id.* at 261.

Even if we assume that the regulation's use of "entire value" is an oblique allusion to the reasoning of these gift tax cases, the three cases do not suggest, as the Commissioner urges, that surrender charges may never be taken into account when valuing a life insurance policy. Rather, when read together, they suggest that "the fair market value of insurance contracts can be a slippery concept," *Schwab*, 136 T.C. at 131, and that a particular method for ascertaining value may be appropriate in one situation but inappropriate in another. We are therefore not persuaded that the example relating to annuities in Treasury regulation section 1.402(b)–1(c) suggests that surrender charges may never be considered

---

[10] Gifts were taxed at their fair market value under the relevant statute. *See Guggenheim*, 312 U.S. at 257 n.4 ("Art. 19(1) provided: '* * * The value of property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. . . .'").

when valuing a life insurance policy distributed from an employees' trust.

On the other hand, there is a different clause in section 1.402(b)–1(c) that proves useful to our analysis: the regulation parrots nearly verbatim the text of section 402(b)(2), providing that "[a]ny amount actually distributed or made available to any distributee . . . shall be taxable under section 72." Treas. Reg. § 1.402(b)–1(c). We have explained our interpretation of this language, and we conclude that it bears the same meaning in the Treasury regulation that it does in the corresponding tax code provision. So rather than overriding what we understand to be the plain meaning of section 402(b)(2), as the Commissioner believes it should, the regulation in fact reaffirms our interpretation of the tax code.[11]

### D.

The Commissioner next argues that we should reject the tax court's treatment of distributions from qualified benefit plans because that approach creates unwarranted anomalies with the taxation of variable life insurance policies while they are held in trust, and with the tax treatment of distributions from qualified investment plans. We discuss each in turn.

An employer's contributions to an employees' trust are taxed according to a different subsection of section

---

[11] Because we find that the text of the regulation is not ambiguous and that the interpretation the Commissioner advances in his briefs are "inconsistent with the regulation," we do not grant deference to those views apart from their inherent ability to persuade. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997).

402(b)—section 402(b)(1)—than are distributions from the trust.  Under the regulations pertaining to section 402(b)(1), contributions to the employee trust are valued and taxed "without regard to any lapse restriction."    Treas. Reg. § 1.402(b)–1(b)(1).  And the tax court has, in a different case, interpreted surrender charges on a variable life insurance policy to be a type of lapse restriction under section 1.402(b)–1(b)(1).  *See Cadwell v. Comm'r*, 136 T.C. 38, 58–60 (2011), *aff'd*, 483 Fed. App'x 847 (4th Cir. 2012).

The Commissioner argues, therefore, that surrender charges should be treated identically when taxing contributions to and distributions from an employees' trust, because "words in different sections of the same statute should be construed similarly."  *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2011).  But therein lies the rub: neither the "contributions" and "distributions" subsections of the tax code, nor the two corresponding subsections of the applicable Treasury regulation, have any meaningful words in common.  In particular, as the tax court noted in this case, the subsection of the regulation applicable to distributions, section 1.402(b)–1(c), "doesn't even mention 'lapse restrictions.'"  *Schwab*, 136 T.C. at 130.  And because it was only the inclusion of that phrase in the regulations relating to employer contributions that led the tax court to value employer contributions without respect to surrender charges,[12] nothing in section 402(b)(1), or the regulations interpreting it, suggests we need to adopt that approach relating to distributions.  We conclude that the possibility that the surrender charge could be disregarded when taxing contributions to an employees' trust, but be taken into account when the assets are later distributed, is not so

---

[12] *See Cadwell*, 136 T.C. at 58–60.

anomalous as to require us to ignore the statutory and regulatory text that produces such a result. Contributions and distributions are, after all, taxed according to two entirely separate subsections of section 402(b).

In his next argument, the Commissioner relies on a different provision of the tax code that *does* share wording with section 402(b)(2). Section 402(a) prescribes the tax treatment of qualified (rather than nonqualified) benefit plans. Much like section 402(b)(2), section 402(a) provides that

> any *amount actually distributed* to any distributee by any employees' trust described in section 402(a) which is exempt from tax under section 501(a) shall be taxable to the distributee . . . under section 72 (relating to annuities).

I.R.C. § 402(a) (emphasis added). In *Matthies v. Comm'r*, 134 T.C. 141 (2010), the tax court concluded that, under the pre-2005 regulations, surrender charges should not be considered when valuing a life insurance policy under section 402(a). *Id.* at 151–52. Treasury regulation section 1.402(a)–1 interprets tax code section 402(a), and the pre-2005 version of that regulation stated that "the *entire cash value* of such contract at the time of distribution must be included in the distributee's income in accordance with the provisions of section 402(a) . . . ." Treas. Reg. § 1.402(a)–1 (emphasis added). The tax court noted that the proposed regulations in 1955 originally referred to the "entire value of such contract," a phrase which the court believed "might plausibly be construed as synonymous with 'fair market value.'" *Matthies*, 134 T.C. at 150–51 (citing Proposed Income Tax Regs., 20 Fed. Reg. 6460 (Sept. 1, 1955)). The

final version of the regulations substituted the phrase "entire cash value" for "entire value of such contract," though, and the tax court reasoned that "the regulations purposefully departed from a generalized valuation standard . . . in favor of a more particularized (and possibly more objective and more easily administered) valuation standard." *Id*. at 151. The tax court concluded in *Matthies*, therefore, that the phrase "cash value" in Treasury regulation section 1.402(a)–1 is "properly construed . . . to refer to cash value determined without regard to any surrender charge." *Id*. at 151.[13]

Returning to the Commissioner's argument, it is true that section 402(a) shares the phrase "amount actually distributed" with section 402(b)(2), and that the tax court in *Matthies* interpreted that provision not to account for surrender charges. It is also accurate that we would normally presume that "a legislative body generally uses a particular word with a consistent meaning in a given context." *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972). But the tax court reached its interpretation of section 402(a) in *Matthies* because of the applicable regulation's command to account for the "entire cash value" of the policy; the regulation interpreting section 402(b)(2) contains no such language. As the tax court explained, "the regulations interpreting each subsection differed before 2005 and continue to differ today. We must apply them as written." *Schwab*, 136 T.C. at 120. To the extent that the Commissioner finds the results anomalous, it is a problem of his own making.

---

[13] *See also* Part B, discussing the appearance of the phrase "cash value" in tax code section 72(e)(3)(A)(i).

**E.**

Neither the regulations interpreting section 402(b)(2), the neighboring provisions of the code, nor the regulations interpreting those neighboring provisions have persuaded us that we must adopt the Commissioner's view that life insurance policies must always be taxed with reference to their "cash value" according to section 72(e)(3)(A)(i) when they are distributed from an employees' trust. Nor has the Commissioner persuaded us that any authority categorically requires that surrender charges always be ignored.

But a puzzle remains. How should the Commissioner quantify insurance policies as an "amount actually distributed" that can be taxed? We conclude that the tax court correctly equated the "amount" in section 402(b)(2) with the fair market value of the policies that were actually distributed. Fair market value is generally understood to be "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." Black's Law Dictionary (9th ed.). In other words, the fair market value of a thing is the amount of consideration someone would pay to acquire it. We do not believe that in drafting section 402(b)(2), Congress intended to tax the distributee on some amount greater (or lesser) than what a rational person would pay for what the taxpayer actually received.

It would also be reasonable to say that the fair market value standard is as close to a generalized valuation standard

as there is in the tax code.[14]  As the tax court has explained, "the concept of fair market value has always been part of the warp and woof of our income, estate, and gift tax laws, and concomitantly the necessity of determining the fair market values of numerous assets for equally numerous purposes has always been a vital and unavoidable function of the tax administrative and judicial process." *Nestle Holdings, Inc. v. Comm'r*, 94 T.C. 803, 815 (1990).  To be sure, the term "fair market value" appears "in about 200 sections of the Internal Revenue Code . . . , and in about 900 sections of the supporting Treasury regulations."   John A. Bogdanski, *Federal Tax Valuation* par. 1.01 (2012).  We affirm the tax court's holding that "the 'amount actually distributed' means the fair market value of what was actually distributed." *Schwab*, 136 T.C. at 131.

### F.

The only questions remaining in this case are whether, as a general matter, surrender charges in life insurance policies can affect the fair market value of those policies, and whether the tax court erred in accounting for them here.  We agree with the tax court that "[t]he variety of insurance policies is too great to adopt as a general rule either the Commissioner's simple proposition that surrender charges should never count,

---

[14] The tax court supported its holding with the observation that the example in section 1.420(b)–1(c) requiring an annuity to be taxed at its "entire value," and that the tax court postulated in *Matthies* that "this . . . phrase—'entire value'—'might plausibly be construed as synonymous with "fair market value"' and represented 'a generalized valuation standard.'"   *Schwab*, 136 T.C. at 131 (*citing Matthies*, 134 T.C. at 150–51).  While the tax court's opinion in *Matthies* is non-binding and represents only a "clue," *Schwab*, 136 T.C. at 131, it certainly points in the right direction.

or Schwab and Kleinman's that such charges should always count, in determining a policy's value." *Schwab*, 136 T.C. at 134. We hold instead that surrender charges may be considered under section 402(b)(2), "but only as part of a more general inquiry into a policy's fair market value."[15]

We disagree with the Commissioner that cases in which courts have ignored surrender charges require us to adopt a rule that a court may *never* consider a surrender charge in determining the fair market value of a life insurance policy for tax purposes. As explained in Part C, the divergent methodologies the Supreme Court used to value paid-up term life insurance policies in *Guggenheim* and *Ryerson* counsel us against adopting a one-size-fits-all methodology for ascertaining the fair market value of a life insurance policy.

And while the Supreme Court did not find surrender charges relevant when valuing the particular policies at issue in *Guggenheim* and *Ryerson*, more recent cases of other circuits illustrate that in other contexts, surrender charges *can* affect the fair market value of a life insurance policy. In 1962, then-Judge Blackmun distinguished *Guggeinheim*, and held that the fair market value of the life insurance policy in that case was the cash surrender value of the policy. *See Gravois Planning Mill Co. v. Comm'r*, 299 F.2d 199, 211 (8th Cir. 1962). There, the taxpayer, Charles Beckemeier, was an officer of the Gravois Planning Mill Company, and Gravois held an insurance policy on Beckemeier's life. *Id.* at 201. Upon his retirement, Beckemeier purchased the insurance policy from the company at its cash surrender value. *Id.* The court held that the price paid—which was the surrender value

_____

[15] Order Denying Reconsideration at 1.

of the policy—was controlling as to the fair market value of the policy. *Id.* at 211.**[16]**

In another case, the Second Circuit explained that "[c]ash surrender value is the more appropriate valuation when it appears that no one is interested in keeping the policy in effect and that anyone receiving the policy would be likely to surrender it to the company for the cash surrender value." *Tuttle v. United States*, 436 F.2d 69, 71 (2d Cir. 1970). There, the court reasoned that a charitable organization receiving a paid-up life insurance policy as a gift would not be expected, when it had no relationship to the insured donee, to hold the policy as an investment. *Id.* at 72. It therefore held that the cash surrender value of the policy, rather than its replacement value, reflected its fair market value in that case. *Id.*

While neither *Gravois* nor *Tuttle* is a perfect analog to this case, both illustrate that surrender charges can, in some cases, appropriately be factored into the fair market value of a life insurance policy. A simple thought experiment bears out the relevance of surrender charges to Schwab and Kleinman's policies here. Consider Kleinman's policy as compared to an identical policy with no surrender charge. At the time of the distribution, Kleinman's policy was set to lapse in 24 days if she did not pay a $108,031 premium. Kleinman allowed the policy to lapse, and because there were applicable surrender

---

[16] In *Gravois*, the Commissioner made arguments strikingly similar to those he makes in this case, claiming that "the right to turn a policy in for cash is only one of the rights an owner possesses; that in addition he has the right to retain it for investment purposes and the right to receive its face amount on the insured's death; and that all these rights demonstrate a value greater than mere cash surrender value." *Id.* at 211.

charges that exceeded the accumulated policy value, "[s]he didn't get any money from the insurance company because her policy's net cash-surrender value was negative." *Schwab*, 136 T.C. at 126. Under the hypothetical policy with no surrender charge, assuming the value of Kleinman's investments remained constant, Kleinman would instead have received the stated policy value, $32,576, when the policy lapsed. Clearly, any rational person would be willing to pay more for a contract that pays out $32,576 in 24 days than a contract that pays out nothing. In this light, it seems difficult to believe, under the facts of this case, that the surrender charges had no effect on the fair market value of the policies.

Finally, prudence counsels us against adopting the Commissioner's proposed ban on considering surrender charges under section 402. Just as variable universal life insurance policies did not exist when the Court decided *Guggenheim* and its companion cases in 1941, ever-creative financial institutions are liable to devise new life insurance instruments that we cannot contemplate today. We therefore decline to tie the hands of the tax court now, or in the future, by adopting the Commissioner's proposed blanket prohibition on considering surrender charges when valuing life insurance policies under section 402.

In light of the foregoing, we affirm the tax court's finding that Schwab and Kleinman's policies did not have "significant value apart from the small amount of the insurance coverage that was attributable to the single premium that Angels & Cowboys had paid on each policy

some three years earlier." *Schwab*, 136 T.C. at 135.[17]   The Commissioner fails to identify any other economic benefits of the policies at the time of their distribution, apart from the insurance coverage they provide.  Aside from arguing that surrender charges may never be considered under section 402(b)(2), the Commissioner does not meaningfully challenge the particulars of the tax court's calculations. Therefore, we will not disturb the tax court's valuation of the Schwab-Kleinman policies.

   **AFFIRMED.**

---

[17] When they were before the tax court, the parties "fought mostly about whether surrender charges could be considered at all," and "they introduced little evidence specifically directed at establishing the fair market values for the policies." *Schwab*, 136 T.C. at 134.  This proved problematic for the Commissioner.  For example, he argued before the tax court that "accumulated cash value can be used to pay costs relating to maintaining the policies in force, can be borrowed against, or can be obtained in exchange for surrendering the policy, as the policy owner may choose." *Id*.  Regardless of whether this is true as a general matter, the Commissioner apparently failed to prove this fact to the tax court with respect to Schwab and Kleinman's policies, and does not renew that argument on appeal. *Id.* at 135–36.  Moreover, both parties apparently declined the tax court's invitation to move to reopen the record to supply data for more detailed calculations, *id.* at 135 n.17, and the Commissioner does not point us to any evidence on record of the policies' value that the tax court failed to consider.