T.C. Memo. 2012-329

UNITED STATES TAX COURT

THOMAS S. GLUCKMAN AND ROBY R. GLUCKMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 21175-09.                    Filed November 28, 2012.

<u>Kathleen R. Barrow</u> and <u>Heather C. Panick</u>, for petitioners.

<u>Brian J. Bilheimer</u> and <u>Brian E. Derdowski, Jr.</u>, for respondent.

MEMORANDUM OPINION

COHEN, <u>Judge</u>: Respondent determined a deficiency of $754,653 and a

section 6662(a) penalty of $150,930.60 with respect to petitioners' joint Federal

income tax return for 2003. The issues for decision are: (1) whether petitioners

were required to include in income the value of two cash value insurance policies

[*2] on their lives that were held by a purported section 419A(f)(6) welfare benefit plan from which petitioners' employer withdrew; and (2) whether petitioners are liable for an accuracy-related penalty under section 6662. Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

This case was submitted fully stipulated under Rule 122. The stipulated facts and accompanying exhibits are incorporated in our findings by this reference. At the time the petition was filed, petitioners resided in New York.

Petitioners are married to each other and at all relevant times together were the majority stockholders in Fownes Brothers & Co., Inc. (Fownes). Fownes is a corporation that designs and manufactures apparel accessories, including boots and gloves. Petitioners each owned 28.94% of the Fownes stock. The remainder was held by petitioners' son and daughter, each of whom owned 21.06% of the Fownes stock. Petitioners were the only directors of Fownes and, during 1999 through 2003, also were employees of the corporation. In addition, Mr. Gluckman served as president of Fownes.

**[*3]** The Advantage Death Benefit Plan

The Advantage Death Benefit Plan and Trust (Advantage Plan) purported to be a "10 or more employer" welfare benefit plan under section 419A(f)(6) providing preretirement life insurance to covered employees who were the beneficiaries of the trust. The plan was not a tax-exempt trust. An employer that chose to participate in the plan contributed money to the Advantage Plan trust. In exchange, the Advantage Plan would pay death benefits for covered employees of the participating employer in accordance with an agreed upon level of death benefits.

To fund the benefits payable to covered employees, the Advantage Plan used participating employers' contributions to acquire cash value life insurance policies (underlying policies) on the lives of the employees, and the plan withdrew funds from the trust as needed to pay the premiums for the underlying policies. The Advantage Plan trustee was required to be the owner and beneficiary of the underlying policies.

The marketing brochure for the Advantage Plan advertised the plan as a tax-advantaged welfare benefit plan for professionals, entrepreneurs, and closely held businesses. Participating employers were assured that their contributions to the Advantage Plan were tax deductible, that plan assets would grow on a tax-deferred

**[\*4]** basis, and that participation in the plan would allow the employer to provide a select group of employees with benefits that could be used to "fund buy/sell arrangements, estate tax and business continuation programs with pre-tax dollars."

Fownes' Participation in the Advantage Plan

Petitioners were introduced to the Advantage Plan by their insurance agent and financial adviser, Lance Rembar. On or about December 15, 1999, Fownes adopted the Advantage Plan. Thomas S. Gluckman (petitioner) was initially designated a covered employee, and the next year Fownes designated Roby R. Gluckman an additional covered employee effective January 1, 2000. In connection with petitioners' participation in the Advantage Plan, life insurance policies insuring petitioners' lives were selected, and the premiums were paid by the Advantage Plan trustee.

At the time Fownes adopted the Advantage Plan, it was administered by Benistar Admin. Services, Inc. Beginning January 1, 2001, and continuing through 2003, BISYS Insurance Services, Inc. (BISYS) was the plan's administrator and sponsor.

[*5]   Under both the original adoption agreement executed in 1999 and the addendum to adoption agreement executed in 2000, covered employees were, among other things, required to be actively employed by the employer.  The Advantage Plan featured a nonreversionary clause that prohibited an employer's contributions from being recovered by the employer or being used for purposes other than for the exclusive benefit of the covered employees in the Advantage Plan or in a succeeding welfare benefit plan.

The plan provided that an employer could terminate its participation at any time.  In that event, the plan trustee was to value the portion of the trust attributable to benefits funded by the withdrawing employer and, after ensuring that the withdrawing employer's share of expenses and liabilities was paid, the plan was required to allow the covered employees to purchase their underlying policies.  Upon an employer's withdrawal, the plan also was permitted to distribute the underlying policies to the covered employees, so long as an actuary retained by the plan determined that sufficient benefits remained in the plan to meet the plan's benefit requirements.  Finally, the plan permitted the underlying policies to be distributed to successor welfare benefit plans that provided similar benefits.

[*6] Termination of the Advantage Plan

In 2002 the Internal Revenue Service (IRS) issued proposed regulations relating to 10 or more employer welfare benefit plans under section 419A(f)(6). See sec. 1.419A(f)(6)-1, Proposed Income Tax Regs., 67 Fed. Reg. 45933 (July 11, 2002). Concluding that the Advantage Plan would not satisfy the proposed regulations should they become final, BISYS decided to terminate the Advantage Plan effective December 31, 2003. Starting in January 2003 and continuing throughout the year, BISYS sent a series of letters and memoranda to insurance agents, brokers, and participating employers to advise them of the approaching termination of the Advantage Plan and the options that participating employers and employees had as a result of the termination.

In one such letter sent to petitioner on May 14, 2003, BISYS stated:

[E]mployers should consider taking steps to voluntarily terminate their participation in The Advantage Plan before December 31, 2003 and electing one of the alternatives outlined below. Otherwise, after December 31, 2003, an employer's participation in The Advantage Plan will automatically terminate, resulting in the surrender of any policies remaining in the Trust, a reallocation of the cash surrender values, and a distribution of the assets to participants. Employers that do not voluntarily terminate participation in The Advantage Plan on or before December 31, 2003 will not have the option of electing one of the alternatives outlined below.

**[\*7] Alternative One -- Employees Retain Policies**
First, the employer terminates its participation in The Advantage Plan. Second, the policies are rolled-out to the
employees and the employees are taxed on the reallocated <u>net</u> cash surrender value of the policies in accordance with the Advantage Plan document.

**Alternative Two -- Employer Adopts The Advantage DBO Plan**
[another BISYS-sponsored plan that purported to be a 10 or more employer welfare benefit plan under section 419A(f)(6)]
First, the employer terminates its participation in The Advantage Plan. Second, the policies are rolled-out to the employees and the employees are taxed on the reallocated <u>net</u> cash surrender value of the policies. Third, the employer adopts The Advantage DBO Plan and the rolled-out policies may in some instances be used as a funding vehicle for The Advantage DBO Plan * * *

<u>Please note that a trustee-to-trustee transfer (i.e., from The Advantage Plan to another welfare benefit plan such as The DBO Plan) is not permitted under applicable IRS regulations</u>. [Emphasis added.]

In July 2003, final regulations for 10 or more employer plans were issued by the IRS. <u>See</u> T.D. 9079, 2003-2 C.B 729. In October 2003, Rembar sent a memo to Fownes titled "Life Insurance Planning and 419: Moving Forward". Rembar advised Fownes to withdraw from the Advantage Plan to avoid the less favorable consequences that would result from BISYS' surrender of the policies upon plan termination. He stated that, after Fownes' withdrawal, the underlying policies held by the Advantage Plan could be distributed to petitioners or to another section 419A(f)(6) welfare benefit plan that met the requirements of the new

[*8] regulations. Rembar recommended that Fownes consider the Millennium

Multiple Employer Welfare Benefit Plan (Millennium Plan). He explained:

> In the absence of notification by the participating employers, BISYS intends to start surrendering to the [insurance] carriers the existing trusted [sic] policies. The resulting pool of net cash surrender funds will after year-end be distributed to the remaining no-longer insured participants. This is not a desirable outcome.
>
> Fownes should promptly send plan termination notice to BISYS. Following the effective termination date * * *, Fownes would have, at the most, 60 days to decide on the future structure for the policies. Termination means that the policies would be distributed intact, not surrendered. If distributed to a welfare benefit trust, the transfer should be a non-taxable event.
>
> *        *        *        *        *        *        *
>
> The non-419 route would be to have the policies distributed to the insureds. Presumably BISYS would issue a [Form] 1099 on the policy's value. * * *
>
> Alternatively, Fownes could continue the premium deductible approach by using the Millennium Plan. BISYS would transfer the policies to the Millennium Plan. This plan-to-plan transfer should avoid the 1099 problem.

On October 17, 2003, having been advised that Fownes wished to withdraw

from the Advantage Plan, BISYS sent a letter to Fownes, care of petitioner,

requesting a certified copy of a corporate resolution authorizing Fownes'

withdrawal from the plan. The letter explained that part of the withdrawal process

was for an employer to reallocate the net surrender values of the underlying

**[*9]** policies among its participants using a formula that took into account the amount of the participants' wage income over the course of their participation in the Advantage Plan. The purpose of this reallocation was to determine what amount, if any, employees who received distribution of the underlying policies would be required to include in taxable income. The letter further advised that "[t]axes may be due, please consult with your tax advisor regarding tax consequences of this transaction." A sample corporate resolution and a form to be signed by all Fownes participants waiving their rights to purchase the insurance policies held by the Advantage Plan trust were attached to this letter.

Fownes submitted a corporate resolution dated October 24, 2003, authorizing Fownes' withdrawal from the Advantage Plan effective November 28, 2003. Fownes also submitted the form, signed by petitioners and two other Fownes participants, by which the Fownes participants waived their rights to purchase the underlying policies.

After receiving Fownes' corporate resolution and signed participant waiver form, on November 6, 2003, BISYS sent partially completed change of ownership and blank change of beneficiary designation forms, as well as the Fownes participants' underlying policies, to Fownes, care of petitioner. The change of ownership forms were already endorsed by the Advantage Plan trustee as the

**[*10]** current owner of the policies. The letter advised that the forms should be completed (for the change of ownership form this was by inserting new owner information and obtaining the new owner's endorsement), then sent directly to the insurance carrier. The forms and the original insurance policies also were provided to petitioners' insurance agent.

On December 17, 2003, petitioner signed an adoption agreement for Fownes to participate in the Millennium Plan. On January 16, 2004, completed change of ownership forms for the underlying policies covering petitioners were sent to the Millennium Plan trustee for endorsement as the new owner of the policies.

On February 13, 2004, the insurance carrier confirmed to BISYS that the owner and beneficiary for petitioners' underlying policies had been changed from the Advantage Plan trustee to the Millennium Plan trustee. Immediately following that confirmation, BISYS sent letters to petitioners stating: "We have completed your employer's termination from the Advantage Death Benefit Plan. You should be receiving tax information from your employer in regards to the termination of the Advantage Death Benefit Plan. Please make sure to communicate that information to your accountant."

[*11] <u>Petitioners' Tax Returns and Examination</u>

Petitioners did not include in taxable income for 2003 any amount related to the underlying policies as a result of Fownes' withdrawal from the Advantage Plan. However, petitioners did include in taxable income for 2002 and 2003 a total of $80,250, which was the estimated value of current insurance benefits of petitioners' underlying policies.

Respondent conducted an examination of petitioners' 2003 jointly filed income tax return and determined that petitioners had unreported income of $2,093,350. This amount represented the value of petitioners' underlying policies at or near the time that Fownes withdrew from the Advantage Plan, less the $80,250 petitioners previously reported in connection with those policies.

Discussion

<u>Underlying Insurance Policies</u>

Generally, taxpayers bear the burden of proving that the Commissioner's determinations are erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). The burden of proof may shift to the Commissioner if the taxpayers establish that they complied with the requirements of section 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with

**[\*12]** the Commissioner's reasonable requests. However, we decide this matter on the preponderance of the evidence and, therefore, the burden of proof is not relevant. See Estate of Black v. Commissioner, 133 T.C. 340, 359 (2009); Knudsen v. Commissioner, 131 T.C. 185, 189 (2008).

Respondent contends that, under section 402(b)(1), petitioners received taxable income in the amount of the value of their underlying policies because their interests in the Advantage Plan trust were substantially vested when Fownes submitted its resolution authorizing withdrawal from the Advantage Plan. Alternatively, respondent contends that petitioners received taxable income under section 402(b)(2) when the Advantage Plan distributed the policy change of ownership and change of beneficiary designation forms to petitioners.

Petitioners argue that they did not receive taxable income relative to the underlying policies because they never owned the policies, they did not control the policies, and their interests in the policies were at all times subject to a substantial risk of forfeiture.

An employee trust is a nonexempt trust if it is not exempt from taxation under section 501(a). See sec. 402(b)(1). The Advantage Plan was an employees' trust that was not exempt from tax and thus was subject to section 402(b) and the

[*13] regulations thereunder.  See, e.g., Schwab v. Commissioner, 136 T.C. 120, 127 (2011).

Section 402(b)(1) provides that employer contributions made to a nonexempt employee trust are included in the gross income of the employee to the extent that the employee's interest in such contribution is substantially vested (within the meaning of section 1.83-3(b), Income Tax Regs.) at the time the contribution is made.  See sec. 1.402(b)-1(a)(1), Income Tax Regs.  If the rights of an employee under a nonexempt employee trust become substantially vested during a taxable year of the employee and the taxable year of the trust ends with or within such year, the value of the employee's interest in the trust on the date of such change is included in the employee's gross income for that taxable year.  See sec. 1.402(b)-1(b)(1), Income Tax Regs.

The "value of an employee's interest in a trust" means the amount of the employee's beneficial interest in the trust as of any date on which some or all of the employee's interest in the trust becomes substantially vested.  See sec. 1.402(b)-1(b)(2)(i), Income Tax Regs.  The parties do not dispute that the proper measure of the value of the underlying policies is the policies' accumulation account values (the values of the insurance policies before imposition of surrender

**[\*14]** charges).  The amounts of the policies' accumulation account values at or near the time period in issue also are not in dispute.

An employee's interest in property is substantially vested when it is either transferable or is not subject to a substantial risk of forfeiture.  Sec. 1.83-3(b), Income Tax Regs.  Whether a risk of forfeiture is substantial depends on the facts and circumstances.  Sec. 1.83-3(c)(1), Income Tax Regs.  A substantial risk of forfeiture exists "where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied."  Id.

Because of the Advantage Plan's requirement that covered employees continue to be employed by the participating employer to remain eligible for benefits, the parties treat petitioners' interests in the Advantage Plan as being subject to a substantial risk of forfeiture before Fownes submitted its corporate resolution authorizing withdrawal from the plan.  Consequently, the treatment of Fownes' contributions to the Advantage Plan from 1999 through 2002 and the status of petitioners' interests in the Advantage Plan trust before Fownes' withdrawal from the plan are not in issue.

**[*15]** Once Fownes submitted its resolution in October 2003, however, the situation was markedly different. Continued employment was no longer a requirement and, under the relevant Advantage Plan provisions, it appears that there were three options for disposition of the underlying policies when an employer withdrew from the plan: (1) the plan could offer the policies for purchase by the covered employees, (2) the plan could distribute the policies to the covered employees, or (3) the plan could transfer the policies to another welfare benefit plan for the covered employees.

As part of the withdrawal process, all of the covered employees of Fownes, including petitioners, signed a form waiving the right to purchase the underlying policies. Additionally, the series of letters the Advantage Plan sent to insurance agents and brokers and participating employers indicated that the plan would not be facilitating direct or trustee-to-trustee transfers of the underlying policies to other welfare benefit plans. Under the plan's stated procedures, that appears to have left only one alternative, which was distribution to the covered employees. In light of the scheduled termination of the plan, BISYS apparently waived the plan's requirement that an evaluation of plan assets and liabilities be performed before distributing the policies to covered employees. There is no mention of this

[*16] requirement in any of BISYS' communications in 2003 with respect to an employer's withdrawal from the plan.

Therefore, consistent with the Advantage Plan's provisions and the plan withdrawal procedures communicated to participating employers, at that point it appears that the underlying policies were substantially certain to be distributed to petitioners or placed within their control. Even if transfers to other welfare benefit plans were still being permitted by BISYS at that time, subsequent events demonstrate that the policies were placed within petitioners' control no later than early November 2003. After receiving the resolution, BISYS sent endorsed, partially completed change of ownership forms that lacked only the new owner information and sent blank change of beneficiary designation forms, as well as duplicate copies of the policies, to petitioner's attention. The forms and the original insurance policies also were provided to petitioners' insurance agent. These actions placed petitioners' underlying policies squarely within their control because petitioners were then free to name the policies' new owner and beneficiary, which could have been themselves or another welfare benefit plan. When a taxpayer has dominion and control over property, the value of such property generally will be included in his or her gross income. See Cadwell v. Commissioner, 136 T.C. 38, 52-56 (2011), aff'd without published opinion, 109

**[*17]** A.F.T.R.2d (RIA) 2012-2693 (4th Cir. 2012); <u>Chambers v. Commissioner</u>, T.C. Memo. 2011-114.

This case is very similar to <u>Cadwell</u>. In that case, the taxpayer was an employee and the only officer of an S corporation. The taxpayer's wife was the sole shareholder and director of the S corporation. The S corporation participated in a 10 or more employer plan under section 419A(f)(6), and the taxpayer was a covered employee under that plan, which held an underlying insurance policy covering the taxpayer. The plan sponsor subsequently converted the multiple-employer plan to a single-employer plan, and we held that, upon conversion, the taxpayer's interest in the plan became substantially vested. The deciding factor with regard to that issue was one of control. After the plan was converted to a single-employer plan, because of the taxpayer's position in the corporation and his close relationship to the sole shareholder, he had the ability to control the assets of the plan and was therefore required to include in his taxable income the value of his underlying insurance policy, which represented his interest in the plan.

There are some factual differences between this case and <u>Cadwell</u>. Here we are concerned with the withdrawal of an employer from a purported section 419A(f)(6) plan rather than the conversion of a welfare benefit plan from a multiple-employer plan to a single-employer plan. The holding in <u>Cadwell</u>,

[*18] however, makes the taxpayer's ability to control the property in question the key factor to consider. In Cadwell, the taxpayer's interest was substantially vested because he gained the ability to control the plan assets when the plan was converted to a single-employer plan. Here, either at the time Fownes submitted its corporate resolution withdrawing from the plan or when the change of ownership and beneficiary forms were sent to them, petitioners gained the ability to control their underlying policies.

Petitioners contend, however, that their interests could not have substantially vested because the underlying policies were at all times owned by a welfare benefit plan and subject to a substantial risk of forfeiture. They argue that transfers to other welfare benefit plans were still being permitted by the Advantage Plan and that the transfer of the policies from the Advantage Plan to the Millennium Plan was a nontaxable trustee-to-trustee transfer. In support of this argument, petitioners cite Rev. Rul. 67-213, 1967-2 C.B. 149, and Rev. Rul. 78-406, 1978-2 C.B. 157. In Rev. Rul. 67-213, supra, the IRS concluded that where funds were transferred from one qualified employee plan to another qualified employee plan without being made available to the participants, the participants did not have taxable income. In Rev. Rul. 78-406, supra, the IRS extended this

**[\*19]** treatment to trustee-to-trustee transfers from one individual retirement account to another.

This Court is not bound by interpretations of the law in revenue rulings. See Johnson v. Commissioner, 115 T.C. 210, 224 (2000); Stark v. Commissioner, 86 T.C. 243, 251 (1986). Furthermore, the IRS has not extended the reasoning in these two revenue rulings to nonqualified plans, such as the Advantage Plan and the Millennium Plan. Most importantly, however, even if trustee-to-trustee transfers to other plans were still being done by the Advantage Plan, such a transfer simply did not occur here. BISYS distributed the change of ownership and change of beneficiary designation forms to petitioners, the covered employees, in care of Fownes and to petitioners' insurance agent, not to another plan trustee.

Once the change of ownership and change of beneficiary designation forms were received, petitioners had the ability to name themselves or another welfare benefit plan as the owner and beneficiary of the underlying policies. Because the policies were subject to petitioners' direct control, the transaction was not a trustee-to-trustee transfer. See Jankelovits v. Commissioner, T.C. Memo. 2008-285 (a trustee-to-trustee transfer is one in which the beneficiary does not gain control or use of the funds); Crow v. Commissioner, T.C. Memo. 2002-178

**[*20]** (trustee-to-trustee transfer treatment only applies where the funds are not within the direct control or use of the participant).

Petitioners also argue that their interests were not substantially vested because after Fownes submitted its resolution authorizing withdrawal from the Advantage Plan, Fownes, through its board of directors, had the ability to control the underlying policies. They contend that Fownes made the decision to adopt the Millennium Plan and determined who would be covered by that plan.

Section 1.83-3(c)(3), Income Tax Regs., is instructive in this situation. In instances where an employee of a corporation owns a significant amount of the total combined voting power or value of all classes of stock of the employer corporation, in determining whether an employee's interest in transferred property is subject to a substantial risk of forfeiture the following factors are taken into account:

> (i) the employee's relationship to other stockholders and the extent of their control, potential control and possible loss of control of the corporation, (ii) the position of the employee in the corporation and the extent to which he is subordinate to other employees, (iii) the employee's relationship to the officers and directors of the corporation, (iv) the person or persons who must approve the employee's discharge, and (v) past actions of the employer in enforcing the provisions of the restrictions. * * * [Id.]

Petitioners are the only directors of Fownes, and petitioner also serves as president of the corporation. Petitioners are married and together are the majority

**[*21]** stockholders in Fownes.  The remainder of the Fownes stock is owned by petitioners' son and daughter.  The record does not contain any evidence of strife in the working or personal relationships of the family members.  Petitioners clearly had the ability to control Fownes' decision-making process and thus had the ability to control their underlying policies.  See, e.g., Cadwell v. Commissioner, 136 T.C. at 54-55.

Petitioners' arguments are unpersuasive, and we determine that petitioners' interests in the Advantage Plan, represented by their underlying policies, were substantially vested under section 402(b)(1) in 2003.  Therefore, we do not consider respondent's argument that petitioners had taxable income under section 402(b)(2).

Section 6662 Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax.  Section 6662(c) defines negligence as including any failure to make a reasonable attempt to comply with the provisions of the Code and defines disregard as any careless, reckless, or intentional disregard.  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the

**[*22]** correctness of a tax return position that is contrary to the rule or regulation. Sec. 1.6662-3(b)(2), Income Tax Regs. An understatement of income tax is substantial if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Because the understatement of income tax is substantial, respondent has satisfied the burden of producing evidence that the penalties are appropriate.

Once the Commissioner has met the burden of production the taxpayer must come forward with persuasive evidence that the penalty is inappropriate because he or she acted with reasonable cause and in good faith. See sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 447, 448. The decision as to whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all of the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners have not addressed the reasonable cause or good faith defenses to the section 6662 penalty. See sec. 6664(c)(1); Higbee v. Commissioner, 116

**[\*23]** T.C. at 448-449. Petitioners simply claim that they did not have unreported income for 2003, a claim that we have rejected for the reasons stated above. They argue that ownership of the policies did not change until 2004. Petitioners apparently relied on their insurance agent and financial adviser in determining that they were not required to include the value of their underlying policies in their income for 2003. However, they produced no evidence indicating that he was competent to give tax advice. Petitioners' income tax return for 2003 was prepared by an accounting firm, but they provided no details regarding what information they gave to their accountant or what the accountant's advice was. We therefore sustain the penalty.

In reaching our conclusions, we have considered all arguments made by the parties and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for

respondent.